UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> V. ) <br> ) <br> ROBERTO HERNANDEZ-HERNANDEZ, ) <br> ) <br> Defendant. ) <br> ) | Crim. No. 3:18-cr-00009-GFVT <br><br> **MEMORANDUM OPINION** <br> **&** <br> **ORDER** |

\*\*\* \*\*\* \*\*\* \*\*\*

The Defendant seeks to suppress evidence resulting from his stop on June 5, 2018. [R. 10.] For the reasons stated below, the Defendant's motion is **DENIED**.

I.

Sometime before June 5, 2018, Immigration and Customs Enforcement (ICE) received a tip that their target, Osbaldo Roblero-Velazquez, would be at 204 Shelby Hall Drive and drove a Ford F-150. [R. 10-1 at 2.] Acting on this information, law enforcement began a surveillance and targeted enforcement operation at the Shelby Hall Drive apartment complex. *Id.* The officers found support for the tip at the outset of the operation when they found an F-150 parked in the shared driveway of units 202 and 204 Shelby Hall Drive. [R. 22.] Now, believing the target to be inside, the officers began to stakeout the property. *Id.* at 2. To prevent detection the officers positioned themselves outside the view of the front of the apartment. *Id.* However, from

this vantage point the front doors of the two adjoined apartment units, 202 and 204, were obscured.[1]  *Id.*  Here they waited.

At approximately 6:30 a.m. Roberto Hernandez-Hernandez exited 202 Shelby Hall Drive and entered the green Ford F-150 parked in the driveway. [R. 10-1 at 4.] After allowing Hernandez to drive a short distance, Detention Officer Sherwood requested Hernandez pull over.[2]  *Id.* at 2. Once Hernandez stopped, Officer Sherwood approached the vehicle and identified himself as an ICE Deportation Officer. *Id.* It was at this time that Officer Sherwood realized that the driver, Hernandez, was not Roblero, the target of the operation.

What happened next is the subject of contention. The record shows two potential scenarios: one in DO James Bugg's Report Narrative and the second in Officer Sherwood's sworn testimony.

In the Narrative Report, Officer Sherwood began by questioning Hernandez about his immigration status shortly after approaching the vehicle. *Id.* Hernandez was asked—and answered no—to whether he had permission to be in the United States. *Id.* Officer Sherwood then requested Hernandez provide a form of identification, and Hernandez provided an expired Mexican driver's license. *Id.*

Conversely, Officer Sherwood testified during the suppression hearing that he first requested a form of identification. Hernandez then produced an expired Mexican driver's license and Officer Sherwood became suspicious that Hernandez was not authorized to be in the United

---

[1] The court does not consider Officer Sherwood's claim that the area was "pitch black" in its analysis. This fact is rejected because sunrise occurred at 6:20 a.m. on June 5, 2018, in the Louisville area. Therefore, ambient light would have been visible by the beginning of the operation at 6 a m.
[2] The government concedes that Hernandez did not commit any traffic violations and the stop was only executed on the belief that Hernandez was Roblero.

States. On this suspicion Officer Sherwood asked whether Hernandez had permission to be in the country. Hernandez responded that he did not.

Regardless of the series of events, Hernandez was then taken into custody and read his *Miranda* rights. At this point, he refused to answer any questions. [R. 10-1 at 2-3.] Upon arriving at the Louisville ICE office Hernandez's fingerprints were scanned, and he was identified as having been previously removed for committing an aggravated felony in Georgia. *Id.*

Hernandez now challenges the stop as a violation of his Fourth and Fifth Amendment rights and a violation of 8 U.S.C § 1357. *Id.* He wishes to suppress all the evidence that was gathered during or as a result of the stop which led to his arrest.

II.

A.

The Fourth Amendment bars unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Even a brief detention short of a traditional arrest is a seizure subject to Fourth Amendment protections. *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). Where there is no probable cause that the suspect committed a traffic violation, law enforcement must show reasonable suspicion of ongoing crime to lawfully stop a vehicle. *U.S. v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012).

A law enforcement officer must have articulable facts to support his reasonable suspicion of criminal activity. *United States v. Cortez*, 449 U.S. 411, 418 (1981). And, the officer must know these facts before initiating the stop—*i.e.*, facts learned after the stop cannot support reasonable suspicion. *Id.* The court must evaluate the reasonableness of an officer's suspicion by reviewing the "totality of the circumstances." *U.S. v. Martin*, 289 F.3d 392, 399 (6th Cir.

2012). This test is less demanding than probable cause but requires more than just "inarticulate hunches." *Id.* Based on this test, the facts of Hernandez stop raise two questions: (i) whether the officers had reasonable suspicion to pull him over in the first instance; and (ii) whether the officer had reasonable suspicion to ask the defendant about his immigration status when he realized that Hernandez was not his target. The court answers both questions in turn.

First, ICE officers had reasonable suspicion to pull over Hernandez. They believed and had good reason to believe that Hernandez was the target of their operation. From their obscured position, Hernandez appeared to exit unit 204 the last location of their target Roblero. What is more, Hernandez then entered the Ford F-150, believed to be driven by Roblero. Contrary to the officers' beliefs, Hernandez had actually exited unit 202 and entered a vehicle owned by his wife. [R. 10-1 at 4.] As is now obvious, law enforcement was wrong on both facts which caused them to stop Hernandez. But Hernandez must show more. The law does not require law enforcement to be perfect; they must only be reasonable. *Maryland v. Garrison*, 480 U.S. 79 (1987) (holding that executing a search warrant on the wrong apartment did not violate the Fourth Amendment). And, as plain as these mistakes may now seem, they were reasonable under the circumstances. From law enforcement's concealed observation place, it was reasonable to believe that Hernandez was Roblero exiting his last known location. This, when combined with Hernandez entering Roblero's reported vehicle, gave law enforcement more than enough evidence to believe Hernandez was their target. Together these two facts adequately supported stopping Hernandez's vehicle. Any finding to the contrary would improperly curtail vehicle stops based on reasonable suspicion of ongoing crime.

Second, whether Officer Sherwood's question was constitutional rests on which version of events is believed. In both Bugg's Report Narrative and Officer Sherwood's testimony,

4

Officer Sherwood recognized immediately that Hernandez was not Roblero.  However, only in Officer Sherwood's account is reasonable suspicion established to ask Hernandez about his immigration status.  Because the court credits Officer Sherwood's testimony it finds no violation.  Nonetheless, for the sake of clarity the court analyzes both scenarios and explains why Officer Sherwood's testimony is accepted.

If, as the Report Narrative relates, Officer Sherwood began his investigation by asking whether Hernandez was lawfully present in the country, then Hernandez's Fourth Amendment rights were violated.  Questions of immigration status need to be supported by reasonable suspicion.  *Brignoni-Ponce*, 422 U.S. at 882.  But Officer Sherwood's realization that Hernandez was not Roblero removed any reasonable cloud of suspicion that Hernandez was unauthorized to be present in the country.  Indeed, at that point the only evidence that Hernandez was illegally in the United States was his ethnicity.  The Court cannot be more clear—ethnicity can never support reasonable suspicion.  *Id*.  Officer Sherwood, unsupported by reasonable suspicion, cannot ask Hernandez about his immigration status. Given Officer Sherwood's position as a longstanding immigration enforcement officer – fluent in the contours of immigration law – all evidence that resulted from this stop would need to be suppressed as fruit of the poisonous tree.  *U.S. v. Pacheco-Alvarez*, 227 F.Supp.3d 863 (S.D. Ohio 2016); *U.S. v Jimenez-Robles*, 98 F.Supp.3d 906 (E.D. Mich. 2015).  In particular, Hernandez's admission would need to be suppressed.

Alternatively, if as Officer Sherwood testified that he first asked for Hernandez's driver's license, then no Fourth Amendment violation happened.  As the United States correctly notes, Kentucky law allows an officer to ask for a driver's license.  Ky. Rev. Stat. § 186.410;  Ky. Rev. Stat. § 186.510.  Exactly as Officer Sherwood says he did.  Hernandez then presented a four-year

5

expired Mexican driver's license which caused Officer Sherwood to believe that Hernandez was not legally permitted in the country. Under 8 U.S.C. § 1357 an immigration officer may ask about immigration status when the officer has reasonable suspicion that someone is illegally present. The court does not second guess that Hernandez's expired driver's license provided a foundation for reasonable suspicion that Hernandez was not authorized to be in the United States. Certainly, this line of questioning is expressly authorized by Congress.[3]

While the court is deeply concerned by the facts outlined in the Report Narrative, it is nonetheless persuaded by Officer Sherwood's testimony during the suppression hearing. Several factors indicate the reliability of Officer Sherwood's testimony. First, the testimony was given under oath with the threat of perjury. Second, Officer Sherwood was subject to cross-examination giving Hernandez ample opportunity to test any inconsistencies between Officer Sherwood's testimony and the Report Narrative. Hernandez should not be advantaged simply because he failed to use this opportunity. Third, Officer Sherwood, the arresting officer, did not prepare the Report Narrative and the report Officer Sherwood *did* prepare does not contradict his testimony.[4] A second-hand Report Narrative is less reliable for the same reasons that the Federal Rules of Evidence typically exclude such reports as hearsay.[5] Fed. R. Evid. 803(8). As acknowledged previously, the above listed factors cause the court to view Officer Sherwood's testimony as the most accurate retelling of the stop. As a result, Hernandez's motion to suppress evidence as the fruit of unconstitutional search and seizure is **DENIED.**

B.

---

[3] Congressional statutes cannot abrogate Constitutional rights but the facts in this case do not approach this boundary.
[4] The report prepared by Sherwood relates, without detail, that he conducted a vehicle stop.
[5] The court acknowledges that one reason for their inadmissibility is that they tend to favor law enforcement.

The Fifth Amendment protects individuals, including aliens, from unwarned self-incrimination. *Miranda v. Arizona*, 384 U.S. 436 (1966); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). However, a *Miranda* warning is only required when a defendant is in custody *and* being interrogated. Because Hernandez cannot show he was in custody, the court does not reach the question of whether Hernandez was being interrogated.

As an initial matter, traffic stops are generally non-custodial and do not require *Miranda* warnings. *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984). Traffic stops tend to be non-custodial because they are usual "brief, non-threatening, and conducted in the presence of others," but not all traffic stops follow this rubric. A more coercive stop may entitle a defendant to *Miranda* warnings. *Id*. In *Swanson*, the Sixth Circuit outlined the factors for when a vehicle stop has become so coercive as to become custodial in nature. U.S. v. Swanson, 341 F.3d 524, 529 (6th Cir. 2003). These factors include: (i) whether a reasonable person in the defendant's position would feel free to leave; (ii) the purpose of the questioning; (iii) whether the place of the questioning was hostile or coercive; (iv) the length of questioning; and (v) other indicia of custody such as whether the suspect was told he was free to leave, could move freely during questioning, and whether the defendant initiated the contact with police or agreed to answer some questions. *Id.* None of these factors is dispositive; the test is the totality of the circumstances. *Id.*

Considering each factor in turn, the court finds that, on balance, the totality of factors weigh against custody. The first and lone factor, whether the defendant reasonably would have felt free to leave, point towards custody. However, this factor by itself is not enough to offset the rest.

Only Hernandez's reasonable belief that he was not free to leave supports his claim that he was in custody. Unlike a traditional single-officer traffic stop, Hernandez was confronted, though indirectly, by three ICE officers. [R. 10-1 at 2.] This show of force was amplified by Officer Sherwood's appearance in tactical gear. Officer Sherwood's testimony that Hernandez was free to leave belies reality. Indeed, his confession that he would view Hernandez leaving as flight and would have informed local authorities reveals the truth – a reasonable person would not have felt free to leave.

The remaining factors show Hernandez was not in custody. Most importantly, Officer Sherwood's questioning was narrowly tailored to the reason for continuing the stop and the questions were not facially incriminating. *Swanson*, 341 F.3d at 524. After stopping Hernandez, Officer Sherwood was permitted to ask for identification; Hernandez provided an expired Mexican driver's license. Officer Sherwood's statutorily authorized question about Hernandez's alienage flowed naturally from this exchange.

These facts are distinguishable from the cases cited by Hernandez on two grounds. First, in *Jimenez-Robles* and *Pacheco-Alvarez*, law enforcement's questions about immigration status were untethered from the reason for the stop. *Jimenez-Robles*, 98 F.Supp.3d. at 917; *Pacheco-Alvarez*, 227 F.Supp.3d at 882. For example, in *Pacheco-Alvarez*, a the defendant was pulled over for a traffic infraction. *Pacheco-Alvarez,* 227 F.Supp.3d at 882. Enforcement of the traffic infraction served merely as a pretext for the officer to ask about and establish the foundation of an immigration offense. *Id.* Here, Hernandez's expired Mexican driver's license caused Officer Sherwood to believe that Hernandez was not authorized to be in the United States. Therefore, Officer Sherwood's immigration question was narrowly tailored to the reason—an expired Mexican driver's license—for the stop.

The second key distinction between Hernandez's case and the cases he cites is that, in *Jimenez-Robles* and *Pacheco-Alvarez*, law enforcement had reason to believe that the defendant had committed an immigration crime, not a civil immigration offense, because they knew of prior deportations. *Jimenez-Robles*, 98 F.Supp.3d. at 913; *Pacheco-Alvarez*, 227 F.Supp.3d at 884. Therefore, when law enforcement asked the defendants about their immigration status, they knew the response was likely to be incriminating. *Jimenez-Robles*, 98 F.Supp.3d. at 913; *Pacheco-Alvarez*, 227 F.Supp.3d at 884. Conversely, at the time Officer Sherwood asked Hernandez if he was permitted be in the country, he had no reason to believe that his unlawful status was anything other than a civil offense. Regardless of Hernandez's response, whether yes or no, there was a substantial likelihood that it would *not* be incriminating.

Regardless, *Pacheco-Alvarez* can be read to require warnings for all immigration questions. The rationale being that immigration status is the predicate to all immigration crimes. *Pacheco-Alvarez*, 227 F.Supp.3d at 884. This proves too much. Most immigration offenses are not criminal and therefore most responses to immigration questions are not incriminating. *Arizona v. U.S.*, 567 U.S. 387 (2012). Extending the logic that questions about the predicate of an offense require a warning would prevent many valid and vital law enforcement questions. For example, law enforcement would be barred from asking a driver where they traveled from because interstate travel is the predicate for a significant number of federal crimes. At bottom, it cannot be the case that a warning is always required because some immigration cases are criminal.

Next, Hernandez's place of questioning was not overtly coercive. *Swanson*, 341 F.3d at 524. It is true that the time of the questioning, shortly after sunrise, and the number of officers' present increased the coerciveness of the stop. *Pacheco-Alvarez*, 227 F.Supp.3d at 882-83.

However, like most roadside stops it was conducted in plain view of the pass public. *Berkemer*, 468 U.S. at 437-38. And, more significantly, Hernandez was not removed from his vehicle until his arrest. Coerciveness is increased greatly when a driver is removed from his vehicle and placed in the back of a law enforcement vehicle.

Further, Hernandez was questioned for an insubstantial period. *Swanson*, 341 F.3d at 524. Only a few minutes had passed before Officer Sherwood asked Hernandez if he was lawfully in the United States. Hernandez incorrectly frames the stop as lengthy by pointing to total time of the stop, 20 minutes. However, the length of the stop was a direct result of Hernandez's expired Mexican driver's license, not because of a fishing expedition by Officer Sherwood. Hernandez stop does not qualify as the lengthy and probing roadside inquiry which *Miranda* and the Fifth Amendment is meant to protect against. That the stop resulted in Hernandez's arrest does not change this calculus.

Finally, consideration of the potpourri of other factors shows that Hernandez was not in custody. *Swanson*, 341 F.3d at 524. Officer Sherwood's initiation of contact and failure to inform Hernandez he was free to leave is offset Hernandez's had free movement. For example, he was not handcuffed or placed in the back of Officer Sherwood's vehicle until his arrest. Indeed, in this way Hernandez's stop echoed that of a traditional vehicle stop.

Having found that Hernandez was not in custody, he was not entitled to *Miranda* warnings. His initial confession that he was not authorized to be in the United States is not suppressed.

C.

ICE has expansive statutory authority enforce immigration laws. This includes the authority to "interrogate any alien or person believed to be an alien as to his right to be or to

remain in the United States" and the authority to "arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation." 8 U.S.C § 1357. However, these powers come with caveats. An ICE officer can only detain a suspect if he has reasonable suspicion based on specific articulable facts that the suspect is illegally in the United States. And, if the officer wishes to make a warrantless arrest, he must have probable cause for the arrest and probable cause that the suspect is likely to escape. 8 C.F.R. § 287.8(b)(2). Hernandez alleges that Officer Sherwood had neither reasonable suspicion to detain him nor probable cause for the arrest. [R. 10.] As the court previously explained, Officer Sherwood had reasonable suspicion that Hernandez violated immigration law. Duplicating this analysis is unnecessary.[6] However, Hernandez is correct that his arrest was illegal. ICE did not have probable cause that Hernandez was likely to flee or probable cause of an independent crime. Unfortunately, Hernandez is left without a remedy.

Because Officer Sherwood did not have a warrant, he needed probable cause of both an immigration crime and probable cause that Hernandez would flee. But Officer Sherwood did not. Officer Sherwood only had probable cause of the immigration offense. In *Pacheco-Alvarez*, the court looked at numerous factors which each indicated a defendant was unlikely to flee. 227 F.Supp.3d at 890. For example, the court looked at whether the defendant: (i) was arrested near his home; (ii) lacked a known criminal history at the time of his arrest; (iii) answered questions without incident; (iv) was working in the area; (v) had a stable residence with a fiancée and children. *Id.* Like a glove, each of these factors fits Hernandez's situation. Hernandez was pulled over blocks from his home after leaving his fiancée and two kids for his job. [R. 10 at 13.] At that time he answered all questions without incident. *Id.* And, by the time

---

[6] See Section II.A.

the decision was made to arrest Hernandez they did not know that he was criminally present. *Id.* In fact, the ICE officers did not discover this until they ran Hernandez's fingerprints at the Louisville ICE station. *Id.* The government has offered no contradicting evidence and has not satisfied its burden of showing Hernandez was likely to flee. *Pacheco-Alvarez*, 227 F.Supp.3d at 889. As a result, the warrantless arrest of Hernandez violated § 1357(a)(2).

A violation of § 1357(a)(2) standing alone cannot trigger the exclusion of evidence. *U.S. v. Abdi*, 463 F.3d 547 (6th Cir. 2006). Still, such a dramatic remedy can be necessary if the arrest does not comply with Fourth Amendment. *Pacheco-Alvarez*, 227 F.Supp.3d at 890-93. In this context, an arrest does not comply with the Fourth Amendment unless the government can show probable cause of an independent felony offence at the time of arrest. *Id.* at 893. Hernandez felony of reentry after deportation for aggravated felony could serve as this basis, but this crime was not discovered until after Hernandez was fingerprinted in the Louisville ICE station. [R. 10-1 at 2-3.] Therefore, at the time of the arrest, the only crime Hernandez was known to have committed was being undocumented. This offense, by itself, cannot support a lawful arrest. Under usual circumstances, law enforcement could point to Hernandez's violation Kentucky laws governing driving as authorizing Hernandez's arrest, but DO officers as federal agents require statutory authority. *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) (holding that an arrest for a misdemeanor that is only punishable by a fine does not violate the Fourth Amendment). The United States points to no such authority for state misdemeanor.

Viewing the facts in their entirety, the Court finds that the ICE officers did not have probable cause of independent criminal activity when they arrested Hernandez. ICE officers' failure to follow the statute or establish probable cause of an independent criminal offense renders their arrest of Hernandez illegal. However, application of the exclusionary rule is

impossible. The government has already agreed not to enter into evidence statements made after Hernandez's arrest. [R. 22.] All other evidence was subject to inevitable discovery.

### III.

For the foregoing reasons, and being otherwise sufficiently advised, the Court hereby **ORDERS** that the:

1. Defendant's Motion to Suppress Evidence from and relating to the stop of Roberto Hernandez-Hernandez on June 5, 2018, is **DENIED**.

This the 11th day of December, 2018.

Gregory F. Van Tatenhove
United States District Judge